Neel, Stephen E., J.
At issue in this case is whether defendant OneBeacon America Insurance Company (OneBeacon) and its third-party claims administrator, defendant Resolute Management, Inc.-New England Division (Resolute), are required to pay and reimburse the plaintiff, Mueller Co. (Mueller) for costs incurred in the defense of underlying asbestos personal injury claims, and whether Mueller has the right to continue to control its defense of those claims, including selection of defense counsel. The matter is before the Court on cross motions for summary judgment seeking to establish the parties’ rights and obligations. For the reasons set forth below, the motions will be denied.
BACKGROUND
Mueller, whose former parent company was Tyco International (US) Inc. (Tyco), is a named defendant at least 230 lawsuits alleging bodily injury as a result of exposure to asbestos or asbestos-containing products manufactured, supplied, distributed or sold by Mueller. OneBeacon is one of several companies that issued comprehensive general liability insurance policies to Mueller.[3],[4] The insuring agreements provide, in pertinent part, that OneBeacon will “defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim as it deems expedient ...” Moss Aff., Ex. A. They also require that “(i]f a claim is made or suit is brought against the insured, the insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative.” Id. The policies provide in addition that “(t]he insured shall not, except at his own expense, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.” Id.
On July 9, 2004, Mueller’s attorney, David J. Herrod, provided notice to OneBeacon of twelve asbestos personal injury cases, and requested that OneBeacon investigate, defend and indemnify it and reimburse it for all sums that it had or would incur in connection with those cases. Goss Aff., Ex. 4. Exhibit Ato Herrod’s letter set out the names, courts, and docket numbers of the cases, and identified specific policies under which Mueller claimed coverage. Herrod did not include the complaints or other information regarding the underlying claims and allegations.
Minnar responded by letter dated August 11, 2004, requesting “full and complete information from you regarding the matter which is the subject of the claim for insurance,” but not specifically requesting any particular items, such as complaints. He also stated that OneBeacon reserved various rights, suggested that Herrod notify Mueller’s other carriers, and requested documentation thereof. Id. Ex. 5.
By letter dated August 13, 2004 (which apparently crossed in the mail with Minnar’s August 11 letter), Herrod repeated his request of July 9, and asking OneBeacon’s attorney, Vickie Price, to “let me know if I can provide any additional material relevant to the Litigation for your review.” Carew Aff., Ex. E.
Minnar and Herrod spoke by telephone on September 1, 2004. Minnar reported, in his notes of the conversation: “Spoke to Ass’d’s atty — Assd is not a target defendant. No settlements made. There are other Mueller Co’s not related to this Mueller — Prod ID is an issue. 12 cases to date. I will get a cov chart. Nothing to do at this time.” Goss Aff., Ex. 6. That report reflects no request from Minnar to Herrod for complaints or other information about the twelve cases beyond what Herrod had already provided; the only specific information Minnar was seeking as of September 2004 had to do not with information about the individual claims, but rather information about other insurers who might share any liability.
Minnar’s focus on other insurance, not specifics of the claims, again surfaces in communications between the parties on Februaiy 2-3, 2005. In a February 2, 2005 email to Russ Piraino, lyco’s in-house counsel (copy to Minnar), Herrod wrote that “Peter *548 Minnar called me this afternoon in connection with the coverage claim to OneBeacon regarding the Mueller asbestos personal injury litigation. Specifically, he asked if Tyco has developed any additional information regarding Mueller primary coverage prior to the Employer’s Liability policy beginning in November of 1969 through the Commercial Union policy in 1984 and whether any additional carriers have been put on notice.” On the same day Minnar forwarded Herrod’s email to Brooke Green, at Resolute, “FYI.” Id., Ex 11. On the next day, February 3, 2005 he adds this request to the items listed by Herrod: “(a]nd whether or not there is primary coverage after us up and until there may be an Asbestos excl.” Id., Ex 7.
With no apparent communication between the parties for several months after the February 2005 emails, on October 7, 2005, Minnar closed the Mueller file and sent it to storage. See quote from Id., Ex. 8, immediately below.
Beginning in June 2006, internal emails reflect that OneBeacon began paying closer attention to the Mueller claims. On June 16, 2006, Minnar wrote to Green, copy to Christopher Dardis:
Well, now that I know which Mueller it is — Oddly, both Mueller cases show up on CAAMPS as mine. I recall that I had only one (Mueller Corp) and Jean had the other. I just checked with Files. The Mueller Corp file was sent to storage, 10/07/05. I’ll get it back. However, to help things along, my recall is that the Insured’s atty did not see much, if any, exposure to Muller (sic) — see the 9/1/04 PN. Time past [sic] and I closed the file on 10/5. To date, we have not heard much from the Insured. When the file is retrieved, I’ll up-date you. At that time, if you wish, I can call the Insured’s atty for an update.
Id., Ex 8. Thus, as of June 2006, Minnar and OneB-eacon had not requested specific additional information from Mueller about the cases themselves.
On June 16, 2006, Green responded to Minnar: “The problem with this account is the number of years of coverage. A small change could have a big impact. Please let me know as soon as you retrieve the file. Also, please call the insured for an update. We need to know how many claims are pending and how much it has paid to date.” Id., Ex. 8.
On June 26, Green emailed Dardis, who responded on June 27 that he had retrieved the Mueller file for review. He also wrote: ‘The file has veiy little in it, so do you think I should call the insured for an update?” Id. On June 28, Green replied: “Please do. OB has a substantial number up on this account and we need to give them a detailed explanation for the closing.” Dardis responded, “I’ll make the call today.”
On June 29, 2006, MaiyLiz Geffert, an employee at Mueller Group with whom Dardis apparently had spoken, emailed Dardis, (“Subject: Asbestos.Claims),” “Please send.me the Herrod letter.” Dardis responds that he will fax “his initial letter to OneBeacon shortly.” Id., Ex. 9.
On June 29, 2006, Green forwarded to Dardis the February 2, 2005 email from Herrod to Piraino which Minnar had forwarded to her “FYI.” Dardis replied: “It looks like there may be some connection after all. Mueller Company acquired by Tyco in 1989 — Sold by Tyco in 1999 — In 2005, Walter Ind acquires Mueller Water Products, Inc. (Mueller Co. of IL is a subsidiary of Mueller Water Products. — I don’t know what occurred between 1999 and 2005.”
On July 6, responding to Green (“Any update?”), Dardis reported:
I have not heard back from anyone at Mueller. The person I spoke with was very confused (understandably) by my call. I asked for an update of the claims, but I don’t think we will receive anything immediately. Beyond that, I have returned the claim and coverage folders to Peter [Minnar] for further handling. We discussed the fact that the file should remain open for the time being.
Id., Ex 11.
On July 11, Stuart Mckay, at OneBeacon, emailed to Green (“Subject: NICO”[5]), “Did Peter get back to you regarding the justification for closing Muller [sic] — asbestos?” Green emailed Minnar, copy to Dardis: “How are you coming on this? We need to document CAAMPS[6] to show there is no exposure or we need to re-open. Let me know.”
Minnar replied the same day:
I just got off the phone with Maiy [Geffert] — She has not read the papers which were sent to her by Chris. She indicated that she was “not in a position” to currently review them. She “needs to research the matter.” Prior to our calls, she was “completely unaware of this matter.” She did say that we could keep our file closed; but, by doing so, would not mean that any future claim for insurance would be waived. She is sending to me her address. I plan to write her a letter asking her to provide me with a current status and ask whether or not she plans to pursue this matter. With this current activity, it appears that this matter will not rest.
Id., Ex. 11.
Also on July 11, Minnar emailed Green, copy to Dardis: “OK — I just got off of the phone with Russ [Piraino, counsel at Tyco] — he will look into the matter and get back to me to advise me if he will pursue a claim; and, if he does, advise me of status of the matter. He, like eveiyone else, did not have a clue as to this matter ...” Minnar also asks whether Green wishes to reopen “the file/CAAMPS . . .” Green responds the same day: “Let’s wait until we hear back from Russ and then decide whether or not you want to open it.”
Again on July 11, Geffert emailed Minnar:
*549 To the extent liability is found against Mueller Co. (now Mueller Co. Ltd, and sometimes referred to as Muller Company) (the “Insured”), we will make claims under the various insurance policies that cover or would cover the liability, including the policies referenced on Exhibit A [of the Herrod letter). To my knowledge, the Malvern Wiltz case is currently proceeding to trial. As for the other matters referred to on the first Exhibit A to the attached letter, I shall research them. However, failure to provide a status update is not a waiver of claim under any insurance policy.
Id., Ex. 10. On July 12, Minnar reported to Green: “Well, here is what I received from Mary — she reiterates what she told me over the phone. If you take this plus what Russ said to me, yesterday, it certainly appears that both camps are well aware of this matter. However, the CAAMPS will remain closed as directed.” Id.
On August 1, 2006, Elizabeth Carew, litigation paralegal at Tyco, sent to Minnar a letter providing OneBeacon “a report regarding the status of the Mueller Company cases and Tyco’s continued request that OneBeacon defend and indemnify Mueller in these cases under the following policies,” which she lists. Id., Ex. 12. The letter demands payment of settlements in the amount of $108,500, and defense costs of $560,000.
Commencing with Carew’s August 1, 2006 letter, communications concerning the Mueller claims were largely between Tyco’s legal department and Minnar.
By letter dated October 27, 2006, Carew provided to Minnar completed “Request for Settlement Authority (RFSA) reports” for four cases, promised more to come, and repeated Tyco’s requests “that OneBeacon defend and indemnify Mueller in all cases under the . . . policies.” Id., Ex. 13.
On January 16, 2007, Minnar responded by letter that Carew’s October 29, 2006 letter “does not provide us with sufficient information for us to decide if we are obligated to provide a duty to defend and/or indemnify Tyco/Mueller Company for any of the expense and settlements connected with your submitted claims.” Id., Ex. 14. Minnar states that “[a]s previously requested, in my August 11, 2004 letter, we require full and complete information. We have no record of receiving the respective summons and related pleadings. Legal bills for which you seek reimbursement need to be forwarded to me for my review. Please provide the names of the other insurance carriers to whom you have given notice,... [and] a complete coverage profile . . .” Id.
Minnar’s January 16, 2007 letter marks OneBeacon’s first request for specific information about the claims.
By letter of March 25, 2008, David M. Nicholas, Tyco’s in-house counsel, wrote to Minnar providing an “update regarding the status of the Mueller asbestos bodily injury suits and a further demand” that OneB-eacon reimburse Tfyco’s defense and settlement costs, totaling $1,582,896. Id., Ex. 15. The letter enclosed the “corresponding complaints,” and informed Minnar that future notification of new complaints would be sent directly through PACE, an electronic notification system. Id.
In a June 25, 2008, letter to Nicholas, Minnar on behalf of OneBeacon (1) agreed to defend Mueller in 35 claims listed on Att. A to the letter (as to which OneBeacon had apparently received copies of pleadings) under policies which OneBeacon primary policies confirmed by OneBeacon for the period November 30, 1966, through November 30, 1984; (2)(a) reserved the right not to pay for claims where there was not bodily injury during the policy period, (b) disclaimed coverage for punitive or exemplary damages, (c) disclaimed any obligation to pay or defend once the primary policy limits were reached, (d) reserved the right to contend that policies were not in effect or were materially different such that no coverage would apply, (e) did not waive other provisions of the policies, applicable to a particular claim, not specifically referred to in the letter, and undertook to advise Tyco as to such; (3) stated that the letter “supersedes all previous letters regarding our position with respect to defense of these matters”; (4) attached a list of defense firms to which he directed Mueller to transfer all defense files; (5) requested copies of complaints for four cases listed in Att. C; and (6) enclosed a check for payment of all past defense cost amounts which One-Beacon determined, according to attached guidelines, it owed to Mueller. Id., Ex. 16. The letter makes no specific objection to the timing of Mueller’s submission of complaints for the claims which OneBeacon agreed to defend.
On July 16, 2008, Nicholas responded to Minnar by letter, rejecting OneBeacon’s demand to transfer the pending suits based on OneBeacon’s reservation of rights and failure to reimburse Mueller fully for past costs. Id., Ex. 17.
On February 27, 2009, Mueller filed this action.[7]
By letter dated March 5, 2009, OneBeacon informed Mueller as follows:
[T]he Companies withdraw their express reservation of rights as to the referenced liability actions and confirmed primary policies, which was most recently set forth in my letter of June 25, 2008. If a matter listed on Exhibit “A” post-dates that reservation of rights, The Companies agree to defend that matter under the confirmed primary policies. If a matter has been tendered but is not listed on Exhibit “A,” The Companies agree to defend that matter under the confirmed policies. Please note The Companies do not intend any waiver . . . The Companies intend to effect their right to control the defense of these matters going forward.
*550 Id., Ex. 19. The letter states that Minnar’s previous request that Mueller transfer defense of the cases to counsel selected by OneBeacon “was ignored on the presumed basis that The Companies’ reservation precluded them from controlling the defense of the liability actions . . . The Companies’ withdrawal of the reservation precludes Tyco from interfering with The Companies’ right to control the defense of these matters in the absence of any reservation.” Id.
Tyco’s counsel responded by letter dated May 12, 2009, noting, inter alia, that OneBeacon’s March 5, 2009 letter “carefully neglects to withdraw your prior reservations as to your indemnity obligations under the referenced policies, or to make a coverage determination as to any of the 207 pending and resolved Mueller asbestos suits, or to pay for any of the $432,775 in settlements . . .” Id., Ex. 20.
The parties now move for summary judgment. The gist of the dispute before the Court is whether Mueller has the right to control its defense of the underlying claims and whether OneBeacon is obligated to reimburse Mueller for costs paid or incurred after the July 9, 2004 letter of notice. Mueller takes the position that OneBeacon’s reservation of rights raises a possible conflict of interest that effectively nullifies OneBeacon’s right to control the defense. OneBeacon responds that Illinois law controls, and that it must decline to defend only when there is an actual conflict of interest. It also argues that Mueller’s claim of a violation of c. 93A fails as a matter of law.
DISCUSSION
Summary judgment may be granted where, viewing the evidence in the light most favorable to the non-moving party, all material facts have been established and the moving party is entitled to judgment as a matter of law. Cabot Corp. v. AVX Corp., 448 Mass. 629, 636-37 (2007); Mass.R.Civ.P. 56(c). “The moving party must establish that there are no genuine issues of material fact, and that the nonmoving party has no reasonable expectation of proving an essential element of its case.” Miller v. Mooney, 431 Mass. 57, 60 (2000). See also Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A declaratory judgment in an action provides an appropriate means of deciding a dispute concerning the meaning of language in a contract. See, e.g., Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 15-16 (1989). The purpose of a declaratory judgment action is “to provide a plaintiff relief from uncertainty and insecurity with respect to rights, duties, status and other legal relations.” Shali v. Bull HN Information Systems, Inc., 437 Mass. 696, 705 (2002).
The detailed background set forth above, and the summary judgment record, establish that genuine issues of material fact exist as to several key issues.
1.Notice
The summary judgment record leaves unresolved whether Mueller’s notice of asbestos claims was sufficient, and if not, whether OneBeacon is estopped from contending otherwise in view of OneBeacon’s arguable acceptance, without objection to its adequacy, of the information provided by Mueller from August 2004 until the commencement of this action.
2.Reservation of Rights
OneBeacon’s “withdraw!al]” of its “express reservation of rights as to the referenced liability actions and confirmed primary policies, which was most recently set forth in [Minnar’s] letter of June 25, 2008,” apparently applies, according to Minnar’s March 5, 2009 letter, page 1, to all claims tendered to OneBeacon by Mueller on or after July 9, 2004, whether or not listed on Exhibit A to that letter.[8] Questions remain, including: as to precisely which rights was OneBeacon withdrawing its reservation? Did those rights include any objections as to notice, or other failures which OneB-eacon now ascribes to Mueller?
3.Conflict of Laws
As just noted, while OneBeacon’s initial correspondence, specifically reserving rights, would justify the conclusion that it had thereby relinquished its right to control Mueller’s defense, its ambiguous March 5, 2009 letter (“withdrawfing]” its reservation of rights on the one hand, but not intending “any waiver” on the other) raises a question of fact as to what if any rights OneBeacon ultimately reserved. Until that issue is resolved by the fact-finder, the basis upon which any conflict of laws analysis rests is not established.[9]
4.Reasonable Costs
With regard to OneBeacon’s obligation to pay any unreimbursed defense costs, fact issues remain as to whether Mueller’s notice thereof was sufficient (or is deemed to be, whether on the basis of the scope of OneBeacon’s withdrawal of its reservation, or of estop-pel), and as to whether the costs were reasonable.
5.Chapter 93A
OneBeacon’s argument that Mueller’s claim for a violation of c. 93A fails as a matter of law is unavailing. The complaint states that the claim is premised on the defendants’ alleged wilful and knowing violation of G.L.c. 176D, §3(9). See Third Amended Complaint, para. 97. “Conduct prohibited in c. 176D is not merely ‘duplicative’ of ordinary breach of contract claims based on the policy, although there may be some parallels. Rather, in this case, engaging in the conduct prohibited by G.L.c. 176D, and made unfair and deceptive by G.L.c. 93A, §9, creates an action independent from the contract.” Schwarz v. The Travelers Indem. Co., 50 Mass.App.Ct. 672, 675 (2001). See also, as to c. 93A, §11, Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 27-28 (1997).
ORDER
For the reasons stated above, plaintiff Mueller Co.’s and defendant OneBeacon America Insurance Co.’s respective motions for summary judgment are DENIED.

 Mueller asserts that OneBeacon issued CGL policies for the period from November 30, 1960 through November 30, 1984; OneBeacon has confirmed coverage only from November 30, 1966 through November 30, 1984.

 The Court will refer to OneBeacon and Resolute collectively as OneBeacon unless otherwise indicated.

 Defendant National Indemnity Company, of which Resolute is a subsidiary. NICO is a reinsurer of OneBeacon.

 Apparently, CAAMPS is Resolute’s electronic claims management system.

 On February 26, 2010, Mueller filed its Third Amended Complaint, asserting, as against OneBeacon, claims for breach of contract (Count I); declaratory judgment (Count II); breach of the implied covenant of good faith and fair dealing (Count III). As against OneBeacon, Resolute and NICO, the complaint asserts claims of civil conspiracy (Count V), and violation of G.L.c. 93A (Count VI).

 Minnar inserts in the “Re:” line at the beginning of the letter, “Mueller Company Asbestos Litigation,” and states that “The Companies withdraw their express reservation of rights as to the referenced liability actions ... If a matter listed on Exhibit ‘A’ post-dates that reservation of rights, The Companies agree to defend that matter ... If a matter has been tendered but is not listed on Exhibit ”A," The Companies agree to defend that matter . . ."

 Nor does the Court necessarily agree with OneBeacon’s argument that Massachusetts and Illinois law conflict, and therefore that a choice of law analysis is necessary, as to the issue of OneBeacon’s duty to defend. “Choice of law analysis is unnecessary when that choice will not affect the outcome of the case.” Kaufman v. Richmond, 442 Mass. 1010, 1012 (2004). Massachusetts law provides that, when an insurer reserves its rights, it loses the right to retain control of the defense of the lawsuit. See, e.g., Three Sons, Inc. v. Phoenix Ins. Co., 357 Mass. 271, 276 (1970); Magoun v. Liberty Mut. Inc. Co., 346 Mass. 677, 682 (1964). Illinois law has the same effect when the interests of the insurer and the insured are not completely aligned, such that a conflict of interest arises. This could occur, for example, if the factual issues in the underlying suit would give the insurer the opportunity to “shift facts in a way that takes the case outside the scope of policy coverage.” Stoneridge Dev. Co. v. Essex Ins. Co., 382 Ill.App.3d 731, 742-43 (2008) (citation omitted). The Court is not persuaded that such a conflict could not arise in this case. See, e.g., American Family Mut. Ins. Co. v. W.H. McNaughton Builders, Inc., 363 Ill.App.3d 505, 512 (2006) (although insurer and insured had mutual interest in finding builder not liable for mold damage, insurer would be equally protected if damage were found to have occurred before policy’s inception).